IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| JOHN SPAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| U.S. BANK, N.A., | ) | |
| | ) | |
| Defendant. | ) | |

**COMPLAINT**

Plaintiff John Span ("Span"), by and through his attorneys, Garfinkel Group LLC and Matt Singer Law, LLC, complains against Defendant U.S. Bank, N.A. ("Defendant" or "U.S. Bank") and alleges as follows:

**INTRODUCTION**

1. Plaintiff John Span is a 55-year-old Black man who devoted more than two decades of his working life to U.S. Bank.

2. U.S. Bank subjected Span to a demeaning, hostile, and racist work environment. For example, one manager would tell him at the end of every week not to "go to jail" or "beat his wife." And a white colleague would make racist jokes and use the word "nigger" to and in front of Span.

3. This openly racist environment in U.S. Bank's indirect auto lending group also adversely impacted loan applicants. Span's white colleagues openly admitted and joked about discriminating against applicants based on their supposed race. Applicants with non-white names would have their applications denied despite otherwise being qualified for a loan by these white underwriters who believed this conduct would help them more easily meet bank metrics and increase their compensation. Unlike his white colleagues, Span refused to engage in this modern-day racial redlining.

1

4.      In October 2018, U.S. Bank hired a new manager, Brian Fioresi ("Fioresi"), to oversee Span's region. From the start, Fioresi was overtly hostile to Span, his only Black direct report. Relying on racist stereotypes of Black intelligence and absent any knowledge of Span's past performance, Fioresi stated he did not "trust" Span's analytical abilities and never would. Thus began a protracted multi-year campaign by Fioresi to get Span fired. Span complained to upper management, including but not limited to Andrew Cecere, the CEO of U.S. Bank, as well as human resources about Fioresi's attempts to set Span up for failure thereby justifying his termination. Span's complaints went unheeded and was ultimately terminated by Fioresi.

## PARTIES

5.      John Span is a resident of Freeport, Illinois, and at all times relevant was domiciled in Freeport.

6.      Defendant U.S. Bank, N.A. (hereafter "Defendant" or "U.S. Bank") is a Fortune 500 company headquartered in Minneapolis

## JURISDICTION AND VENUE

7.      Plaintiff's federal claims arise under 42 U.S.C. § 1981. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343. This Court has supplemental jurisdiction over Plaintiff's state-law claims under the Illinois Human Rights Act ("IHRA") pursuant to 28 U.S.C. § 1367.

8.      Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391 as a substantial part of the events or omissions giving rise to this case occurred in this district.

## FACTUAL ALLEGATIONS

9.      John Span was hired by U.S. Bank in 1996 as a bank teller.

10.     He was subsequently promoted and employed as a loan officer and underwriter in U.S. Bank's mortgage lending department.

2

11. Span later transferred to U.S. Bank's Indirect Lending Department, where he served as an underwriter for more than a decade until his termination.

12. Within Indirect Lending, Span was assigned to the North Central Region, which encompassed the following states: Iowa, North Dakota, South Dakota, Illinois, Indiana, Michigan, Wisconsin, and Minnesota.

13. U.S. Bank's indirect auto lending department provides financing through auto dealerships to car customers purchasing vehicles.

14. The lending is "indirect" because the customer obtains financing through the dealership, rather than dealing directly with the bank.

15. At all times relevant, the North Central Region was serviced by 15-20 underwriters, including Mr. Span.

U.S. Bank's Toxic Workplace Culture

16. Working within this North Central Region, Span was subjected to a toxic and racially hostile work environment.

17. One of Span's manager, Jim Bieganowski, would tell Span every Friday, before the weekend, "don't go to jail and don't beat your wife," or words to that effect. These comments were racist, reflecting stereotypical tropes about Black violence and criminality.

18. Jim Bieganowski would make these comments publicly, including in front of U.S. Bank managers Matthew Woda and Mark Hammond.

19. Despite the overt public nature of these racist comments, U.S. Bank took no action to discipline Bieganowski.

20. U.S. Bank also took no action to protect Span from this toxic work environment.

21. Recognizing that U.S. Bank had created a toxic, consequence free workplace, Span's colleagues felt comfortable racially harassing Span, the only Black underwriter.

22. One white colleague routinely used the word "nigger" in workplace conversations with Span.

23. This colleague and others also openly made racist jokes about Blacks and other ethnic minorities in Span's presence, and again, Mark Hammond overheard these racist jokes.

24. U.S. Bank took no action to discipline any North Central underwriters for use of racist language or making racist jokes.

Underwriter Metrics

25. An underwriter "analyzes, evaluates and makes decisions on consumer loan and lease applications."[1]

26. The position requires balancing two often conflicting goals. The first goal is to "grow loan volumes," while avoiding significant dilution of the "credit quality" of the loan pool (avoiding significant numbers of delinquencies and defaults within the loan pool that impacts overall profitability).[2]

27. During Span's tenure in Indirect Lending, U.S. Bank used the following metrics to assess indirect lending underwriters' performance: (1) Quality of Lending; (2) Production; (3) Customer Service; and (4) Teamwork/Dealer Management/Relationships.

28. Within the Quality of Lending category, the relevant metrics were: (a) monthly quality assurance (QA) reviews; (b) percentage of loans written outside U.S. bank underwriting and pricing guidelines; (c) number of Non-Conforming Loans (NCLs); and (d) number of Early Payment Defaults (EPDs).

---

[1] https://usbank.wd1.myworkdayjobs.com/en-US/US_Bank_Careers/job/Fremont-CA/Dealer-Services-Underwriter-5_2021-0049081
[2] *Id.*

29. The Production category metrics focused on assessing raw numbers of loans underwritten by each underwriter in terms of: (a) total decisions; (b) funded volume; (c) capture ratio; (d) approved ratio; and (e) phone calls.

30. The majority of these metrics were assessed against averages of the performance of all North Central underwriters. For instance, underwriters were expected to fund total volume of at least 80% of the North Central team average.

31. Other metrics were measured as a percentage of all the loans written by the individual underwriter, such as the number of loans written that constituted policy or price exceptions.

32. Underwriter Customer Service was assessed by measuring the turnaround time for application decisions, amongst other metrics.

33. When assessing underwriters, U.S. Bank put greatest weight on EPDs. Underwriters with too many charge-offs or delinquencies would not only suffer in terms of their bonuses, but such outcomes were grounds for termination.

U.S. Bank Indirect Lending Loan Application and Approval Process

34. All loan applications coming into U.S. Bank were first reviewed by an automated system.

35. The system screened loans based on certain criteria such as credit score, income, loan value, vehicle type, and loan term.

36. Loans that were approved through this system are referred to as "auto approvals."

37. Absent any interaction by an underwriter, these loans did not impact an underwriter's metrics.

38. However, auto approval loans could be selectively picked out of the auto-approval queue and opened by underwriters who could modify the terms of the loan to make it more favorable and increase the chance of the dealer/applicant choosing the U.S. Bank loan over a competing loan.

5

39. If the underwriter modified the loan as described in paragraph 36, the underwriter would get credit for originating that loan.

40. Additionally, at times the automated system would approve a loan that did not precisely conform to the Bank's guidelines and an underwriter would be required to review that loan and propose a modification to bring the loan application in conformance with lending guidelines. These loans would be credited to the reviewing as having originated that loan.

41. Where a loan application was denied by the automated system, underwriters would review the denial for purposes of identifying the reason for the denial and whether the terms could be modified such that it would be acceptable per U.S. Bank's lending guidelines. The reviewing underwriter received credit for originating these loans as well.

42. Applications could be denied where the applicant had sufficient creditworthiness but the terms of the loan (e.g. the length of the loan being in excess of 60 months) were outside the bank's guidelines. The underwriters' goal was to try to offer a loan arrangement with terms that met the applicant's desires while conforming with U.S. Bank's lending guidelines.

<u>North Central Organization and Operation Before Brian Fioresi</u>

43. During his time working in U.S. Bank's North Central Region, Span was the only Black underwriter.

44. Within the North Central Region, there was an informal territory system amongst the underwriters whereby each underwriter built relationships with certain dealers and had "first dibs" on reviewing loan applications from those dealers.[3]

---

[3] The ancient legal concept of "first dibs" has been defined as "the right to go first," see *United States v. Richardson*, 780 F.3d 812, 816 (7th Cir. 2015), and has a long history of recognition by federal courts generally and the Seventh Circuit specifically. See e.g., *Bagdon v. Bridgestone/Firestone, Inc.*, 916 F.2d 379, 383 (7th Cir. 1990); *Chicago Pro. Sports Ltd. P'ship v. Nat'l Basketball Ass'n*, 961 F.2d 667, 669 (7th Cir. 1992); and *Samaron Corp. v. United of Omaha Life Ins. Co.*, 822 F.3d 361, 364 (7th Cir. 2016).

45. From the start of Span's employment in Indirect Lending until September 2018 when Fioresi assumed the manager position, Span was designated as a "roaming" underwriter who covered for white underwriters when they were out sick, on vacation, or out to lunch. He handled overflow applications throughout the entire North Central Region.

46. Accordingly, Span did not have a "territory" or dedicated dealers over whose deals he had "first dibs."

47. Not having his own "territory" or dedicated dealer network hindered Span's ability to obtain greater compensation or meet certain underwriter metrics.

48. Span also learned that certain (white) North Central underwriters would avoid approving deals in certain areas of the Region based on that area's reputation as a "bad area" for lending.[4]

49. One such "bad area" was the south side of Chicago and nearby south suburbs, an area that according to the 2020 U.S. Census is over 93% African American.

50. Like a game of racist loan application hot potato, certain North Central underwriters would procrastinate by "taking lunch" or "using the restroom" until some other underwriter was forced to handle the geographically undesirable loan application.

51. These underwriters equated loans to Blacks, Hispanics, and other ethnic groups as "riskier" and simply refused to touch those deals.

52. The motivation for avoiding loans from "bad areas" was to avoid EPDs and thereby improve their own performance as measured by U.S. Bank's metrics.

53. These metrics, and the high importance U.S. Bank placed on avoiding EPDs also encouraged other racial discrimination on the part of underwriters.

---

[4] In violation of the Equal Credit Opportunity Act, 15 U.S.C. §1691, et seq.

54. North Central underwriters would engage in name-based discrimination. Loan applications reviewed by underwriters with "ethnic sounding" names (e.g., names that they arbitrarily decided, based presumably on racial stereotypes, "sounded" African, Muslim, African American, or Hispanic) would be denied loans even where the quantitative portions of the application (credit score, income, etc.) would merit approval.

55. Further, applicants with addresses in predominantly minority neighborhoods or neighborhoods with a "bad" reputation would have their applications denied even where the quantitative portions of the application (credit score, income, etc.) would merit approval.

56. Delays as a result of underwriter's avoidance of handling an application could result in applicants having less bargaining power to negotiate the best possible deal by playing one lender off against another. For example, an applicant who banked at another institution, and wanted to obtain a loan from that institution, could not use a competing offer from U.S. Bank to negotiate more favorable loan terms with their bank.

57. Further, when North Central underwriters engaged in redlining to deny a loan application based on an applicant's name, address, or the location of the dealership, the applicant was harmed in that the applicant received less access to credit (via receiving less credit options) as a white applicant with identical quantitative creditworthiness. As a result, these redlined applicants may have been forced to accept a loan offered by another lending institution on less favorable terms.

58. Disgusted by the practices of his colleagues, Span refused to engage in racial discrimination in his underwriting.

59. Despite being pigeonholed as a "roamer," being denied a fair opportunity to earn compensation his white colleagues received, and facing routine and outrageous racial harassment, Span managed to put his head down and do his job as best he could under his circumstances.

60. Prior to September 2018, when Fioresi became his manager, Span had no disciplinary record and consistently received strong performance reviews.

North Central Organization and Operation Under Brian Fioresi

61. In September 2018, U.S. Bank hired Fioresi to be the new manager of the North Central Region of its indirect lending department.

62. In his first meeting with his new team, Fioresi made clear that he wanted to clean house of U.S. Bank's older and more experienced underwriters. Fioresi publicly and unabashedly stated that he "did not like working with employees that had been at the bank for longer than ten years." He said that he "preferred young blood." Fioresi promised that if he needed to fire one of the older underwriters "to set an example," he would.

63. Just as he promised, Fioresi immediately set his sights on removing Span, the only Black underwriter on the team, and one of its oldest and most experienced.

64. In their first face-to-face meeting in January 2019, Fioresi told Span directly that he did not "trust" Span's analytical ability as an underwriter and that he never would.

65. Fioresi's assumption that he did not and never would "trust" Span's "analytical" ability was based purely on racist and stereotypical assumptions, at the time he made the comment, Fioresi had never previously met Span and could not yet have any knowledge to form a basis for the assessment of his analytical capabilities.

66. Fioresi proceeded to criticize Span for his performance based on the performance metrics described in Paragraphs 25-33. But as U.S. Bank and Fioresi were aware, it was impossible for Span, as a "roamer," to compete in many of these metrics against other underwriters with dedicated territories.

9

67. In or about January 2019, Fioresi formalized the previously informal territory system. He divided up the North Central Region into smaller territories and assigned the best territories to his preferred underwriters.

68. One of the formally demarcated territories Fioresi gerrymandered was the South Chicago, South Suburbs territory, which included the aforementioned "bad area" in which several white underwriters avoided lending.

69. This formalized territory system made it easier for Fioresi's favored underwriters to avoid lending in South Chicago and constituted literal redlining – a line was drawn around the area containing the largest population of African Americans in the North Central Region and every underwriter but those targeted by Fioresi to have this territory could simply avoid underwriting deals from this territory.

70. Auto sales are not a Monday to Friday business; therefore, the indirect lending department is required to operate on Saturdays and was typically staffed with approximately five underwriters on Saturdays.

71. As such, the favored underwriters who engaged in the aforementioned redlining practices were still required to handle loans from outside their assigned territory if they were working on Saturday.

72. The previously described discrimination against applicants based on their name, or the geographic location of the dealership or the applicants home address continued under Fioresi.

73. This applicant name- and address-based-discrimination also occurred within the underwriters' own territories. Therefore, even applicants with non-white sounding names who did not reside or purchase cars in South Chicago were subject to the same discrimination as described earlier.

Fioresi Schemes to Terminate Span

74. Initially under Fioresi's new formal territory system, the only underwriter who wasn't assigned a territory was John Span, one of the oldest underwriters, and the lone African American, in the North Central region. For much of 2019, Span was responsible for handling overflow from the territories of the other underwriters.

75. Unsurprisingly, Span's performance as measured by several of U.S. Bank's underwriter metrics paled in comparison to his peers.

76. Fioresi subsequently criticized Span's performance during quarterly reviews for the first three quarters of 2019. Span rightly complained that Fioresi's criticism was not fair given that Span, unlike his peers, was a "roamer" with no assigned territory.

77. Recognizing that it would be difficult to justify firing Span if he was a "roamer" who lacked a sales territory, in or about October 2019, Fioresi assigned Span a territory for the first time in his career, unsurprisingly it was the "Chicago South" territory.

78. This territory was regarded as the worst territory by underwriters in the North Central region, who perceived this area as having a higher rate of fraud, charge-offs, delinquencies, and defaults. Compared to the other territories, Chicago South had lower rates of luxury vehicle purchases, which in turn generated fewer high dollar value loans.

79. Accordingly, underwriters simply avoided underwriting loans originating out of this territory unless they had no way to side-step or pass off handling the application.

80. In the months before Fioresi assigned Span to cover the Chicago South territory, **three** white underwriters had been assigned to cover the territory. All three had performed poorly as measured by U.S. Bank metrics. All three asked to leave the territory and were quickly assigned a new territory or transferred to a different department within the Bank.

81. Of all the underwriter metrics, Fioresi put greatest emphasis on underwriters increasing their funded volume – to increase the total dollar amount of loans issued.

82. Fioresi and U.S. Bank understood that Span, like the three underwriters who came before him, could not meet both Fioresi's demand for high funded volume while also meeting the metrics for loan quality in the Chicago South territory.

83. In Chicago South, unlike the other territories, it was impossible to maintain this balance in accordance with the bank's metrics. If Span acted with appropriate caution in declining to approve problematic applications, Fioresi would discipline him for not meeting funded volume metrics. If Span approved riskier loans to increase his funded volume and had higher defaults or delinquencies, Fioresi would discipline him for approving bad loans.

84. Like the three previous white underwriters assigned to the Chicago South territory, Span could not meet the Fioresi's and the bank's metrics; but unlike the others, he was not reassigned or offered a different position. Instead, Fioresi and U.S. Bank in a transparently racially and ageist motivated campaign, disciplined and subsequently terminated him.

85. In January 2020, U.S. Bank formally disciplined Span for the first time in his two-decade career at U.S. Bank, issuing what it called a "verbal counseling." Span was criticized for his performance against certain metrics.

86. The verbal counseling escalated to an "action plan" in April 2020, right as the COVID-19 pandemic shut down most of the American economy. The "action plan" was, again, heavily focused on Span's performance against certain of the bank's racially biased metrics.

87. In the wake of being assigned the "action plan," Span was assigned a "coach" who advised him on methods to improve his performance on certain metrics.

88. The "coach" advised him to do what other underwriters did to boost their numbers. Specifically, to game the system by pulling loans approved by U.S. Bank's automated underwriting

system out of the "auto approval" queue and tweak the terms of the loan slightly (e.g., slightly improve the interest rate compared to the auto-approved interest rate). Thereby taking credit for origination of that loan.

89. Span had previously been informed that it was against bank policy to pull loans from this pool of "auto approvals," but the coach informed him this was not true—in fact, the white underwriters regularly cherry picked the auto approval queue to boost their numbers.

90. By following his coach's instructions, Span was able to improve his loan numbers.

91. In doing this, Span discovered that when certain white underwriters would cherry pick auto approvals, they would refuse to select deals with applicants who had non-white sounding names.

92. It was Span's understanding that his colleagues equated risk to the applicant's race/ethnicity and discriminated accordingly in an attempt to meet U.S. Bank metrics and boost their bonuses.

93. Upon learning what Span was doing, Fioresi berated Span, until he learned that Span had been told by his coach to emulate his white colleagues and cherry pick the auto approval queue.

94. During 2020, while Span continued to work to improve his loan numbers, he repeatedly complained to U.S. Bank's human resources department and contacted U.S. Bank executives, including its President and CEO Andrew Cecere, about Fioresi's discriminatory and hostile treatment.

95. In particular, and amongst other complaints, Span shared Fioresi's comment about wanting to fire older and more experienced employees in favor of "young blood." He also sought the "opportunity to work under a different manager who is non biased [*sic*] towards me. Mr. Fioresi is biased and is showing a pattern of harassment in his interactions with me."

96. In response to and in retaliation for Span's complaints, Fioresi and U.S. Bank escalated its efforts to fire him.

13

97. Despite Span's improvement in the second quarter of 2020, during the worst of the COVID-19 crisis, U.S. Bank and Fioresi continued their crusade to terminate him.

98. In July 2020, U.S. Bank fired Span.

99. U.S. Bank's sole justification for doing so was Span's failure to satisfy certain metrics in April 2020, the peak of the COVID-19 pandemic and corresponding low point of lending volume

100. Span was the only underwriter terminated in the North Central Region on this basis.

101. Span's termination also contrasts with U.S. Bank's treatment of the three white underwriters who previously worked the South Chicago region, who were reassigned to different territories or bank departments rather than terminated.

102. As a direct and proximate result of U.S. Bank's conduct, Span has suffered wage and financial losses and irreparable damage to his career.

103. As a direct and proximate result of U.S. Bank's conduct, Span has suffered emotional and mental distress, loss of reputation, embarrassment and humiliation, loss of enjoyment of life, inconvenience, and other non-pecuniary losses.

104. By the acts and conduct described above, U.S. Bank intended to cause Span severe emotional distress, or acted in reckless disregard of the injury that its actions had caused and would cause to Span.

105. Punitive damages are appropriate because U.S. Bank's conduct was malicious and/or U.S. Bank was recklessly indifferent to Span's protected rights.

106. Span timely filed a charge of discrimination with the Illinois Department of Human Rights ("IDHR"), alleging age and race discrimination and retaliation. Span opted out of the IDHR's investigation and the IDHR issued a Notice of Opt Out. Accordingly, Span has satisfied all the necessary prerequisites to filing this suit.

## COUNT I
## RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981

107. Plaintiff realleges Paragraphs 1-106 and incorporates them by reference as though fully stated herein as part of Count I of this Complaint.

108. Section 1977 of the Revised Statutes, 42 U.S.C. § 1981, as amended, guarantees persons of all races the same right to make and enforce contracts, regardless of race. The phrase "make and enforce" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship, including employment relationships. Section 1981 also prohibits employers from engaging in racial harassment of their employees.

109. As described above, U.S. Bank maintained discriminatory and harassing employment practices that constitute illegal race discrimination in violation of 42 U.S.C. Section 1981.

110. Plaintiff was subjected to and harmed by U.S. Bank's discrimination based on his race, Black.

111. As a direct and proximate result of U.S. Bank's conduct, Plaintiff suffered damages.

## COUNT II
## RETALIATION IN VIOLATION OF 42 U.S.C. § 1981

112. Plaintiff realleges Paragraphs 1 through 106 and incorporates them by reference as though fully stated herein as part of Count II of this Complaint.

113. Section 1981 makes it unlawful for an employer to retaliate against an employee because that employee engaged in protected activity, such as reporting or challenging racial discrimination.

114. As described above, Plaintiff engaged in protected activity.

115. U.S. Bank took adverse employment action against Plaintiff in retaliation for engaging in this protected activity.

116. Plaintiff was subjected to and harmed by U.S. Bank's retaliation after he reported U.S. Bank's discriminatory conduct.

117. As a direct and proximate result of U.S. Bank's conduct, Plaintiff suffered damages.

## COUNT III
## RACE DISCRIMINATION IN VIOLATION OF IHRA
## (DISPARATE TREATMENT)

118. Plaintiff realleges Paragraphs 1 through 106 and incorporates them by reference as though fully stated herein as part of Count III of this Complaint.

119. Under IHRA, it is a civil rights violation for any employer to refuse to hire, segregate, or to act with respect to recruitment, hiring, promotion, renewal of employment, selection for training or apprenticeship, discharge, discipline, tenure or terms, privileges or conditions of employment on the basis of unlawful discrimination, which includes race discrimination. 775 ILCS 5/2-102(A). IHRA also prohibits harassment of employees based on their race. *Id.*; 775 ILCS 5/2-101(E-1).

120. Plaintiff was an employee of U.S. Bank, and U.S. Bank was Plaintiff's employer within the meaning of the IHRA. 775 ILCS 5/2-101.

121. As described above, U.S. Bank discriminated against and harassed Plaintiff on account of his race, Black.

122. As a direct result of this violation of the IHRA, Plaintiff suffered damages in the form of lost wages, benefits, and employment opportunities, and severe emotional distress.

## COUNT IV
## RACE DISCRIMINATION IN VIOLATION OF IHRA
## (DISPARATE IMPACT)

123. Plaintiff realleges Paragraphs 1 through 106 and incorporates them by reference as though fully stated herein as part of Count IV of this Complaint.

124. Under IHRA, it is a civil rights violation for any employer to refuse to hire, segregate, or to act with respect to recruitment, hiring, promotion, renewal of employment, selection for training

or apprenticeship, discharge, discipline, tenure or terms, privileges or conditions of employment on the basis of unlawful discrimination, which includes race discrimination. 775 ILCS 5/2-102(A). IHRA also prohibits harassment of employees based on their race. *Id.*; 775 ILCS 5/2-101(E-1).

125. Plaintiff was an employee of U.S. Bank, and U.S. Bank was Plaintiff's employer within the meaning of the IHRA. 775 ILCS 5/2-101.

126. As described above, U.S. Bank engaged in policies and practices that had a disparate impact on its Black underwriter, Span. In particular, U.S. Bank evaluated its underwriters using facially neutral metrics that disproportionately and negatively affected its Black underwriter, Span.

127. As a direct result of this violation of the IHRA, Plaintiff suffered damages in the form of lost wages, benefits, and employment opportunities, and severe emotional distress.

## COUNT V
## AGE DISCRIMINATION IN VIOLATION OF IHRA

128. Plaintiff realleges Paragraphs 1 through 106 and incorporates them by reference as though fully stated herein as part of Count V of this Complaint.

129. Under IHRA, it is a civil rights violation for any employer to refuse to hire, segregate, or to act with respect to recruitment, hiring, promotion, renewal of employment, selection for training or apprenticeship, discharge, discipline, tenure or terms, privileges or conditions of employment on the basis of unlawful discrimination, which includes age discrimination against individuals who are more than 40 years old. 775 ILCS 5/2-102(A).

130. Plaintiff was an employee of U.S. Bank, and U.S. Bank was Plaintiff's employer within the meaning of the IHRA. 775 ILCS 5/2-101.

131. As described above, U.S. Bank discriminated against Plaintiff on account of his age, which was greater than 40.

132. As a direct result of this violation of the IHRA, Plaintiff suffered damages in the form of lost wages, benefits, and employment opportunities, and severe emotional distress.

## COUNT VI
## RETALIATION IN VIOLATION OF IHRA

133. Plaintiff realleges Paragraphs 1 through 106 and incorporates them by reference as though fully stated herein as part of Count V of this Complaint.

134. Under IHRA, it is a civil rights violation for an employer to retaliate against employee "because he or she has opposed that which he or she reasonably and in good faith believes to be unlawful discrimination." 775 ILCS 5/6-101.

135. Plaintiff was an employee of U.S. Bank, and U.S. Bank was Plaintiff's employer within the meaning of the IHRA. 775 ILCS 5/2-101.

136. As described above, Plaintiff opposed practices which he reasonably and in good faith believed to be unlawful discrimination.

137. As described above, U.S. Bank took adverse employment action against Plaintiff in retaliation for engaging in this protected activity.

138. As a direct result of this violation of the IHRA, Plaintiff suffered damages in the form of lost wages, benefits, and employment opportunities, and severe emotional distress.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against U.S. Bank and award the following relief:

a. Declare that the acts and conduct of U.S. Bank are unlawful and violate 42 U.S.C. § 1981 and the IHRA;

b. Award Plaintiff the value of all compensation and benefits lost as a result of U.S. Bank's unlawful conduct;

c. Award Plaintiff the value of all compensation and benefits he will lose in the future as a result of U.S. Bank's unlawful conduct;

d.  Award Plaintiff compensatory damages, including but not limited to damages for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, loss of reputation, and other non-pecuniary losses;

e.  Award Plaintiff punitive damages due to U.S. Bank's malicious conduct and/or reckless or callous indifference to the statutorily protected rights of Plaintiff;

f.  Award Plaintiff prejudgment interest;

g.  Award Plaintiff attorneys' fees, costs, and disbursements; and

h.  Award Plaintiff such other make whole equitable, injunctive, and legal relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues of fact and damages triable in this action.

Respectfully submitted,

*/s/ Haskell Garfinkel*                                                   */s/ Matthew Singer*

Haskell Garfinkel                                                          Matthew J. Singer
Max Barack                                                                  MATT SINGER LAW, LLC
Matthew Fletcher                                                          77 W. Wacker Dr., Suite 4500
GARFINKEL GROUP, LLC                                            Chicago, Illinois 60601
6252 N. Lincoln Avenue, Suite 200                              Phone: 312-248-9123
Chicago, IL 60659                                                         Matt@MattSingerLaw.com
Phone: (312) 736-7991
Haskell@Garfinkelgroup.com
Max@Garfinkelgroup.com
Matthew@Garfinkelgroup.com