**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| JOHN SPAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 21-cv-5938 |
| | ) | |
| U.S. BANK, N.A., | ) | Hon. Sara L. Ellis |
| | ) | |
| Defendant. | | |

## DEFENDANT'S ANSWER AND DEFENSES TO COMPLAINT

Defendant U.S. Bank, N.A., by and through its attorneys, Winston & Strawn, LLP, provides

the following answers and defenses to Plaintiff's Complaint:

## INTRODUCTION

1.     Plaintiff John Span is a 55-year-old Black man who devoted more than two
decades of his working life to U.S. Bank.

**Answer**:     Defendant admits that the Plaintiff in this action is John Span, that he identifies as

a Black male, and that he worked for U.S. Bank from March 2, 1998 through July 1, 2020

Defendant is without knowledge or information sufficient to form a believe as to the remaining

allegations of Paragraph 1 and, there, denies same.

2.     U.S. Bank subjected Span to a demeaning, hostile, and racist work environment.
For example, one manager would tell him at the end of every week not to "go to
jail" or "beat his wife." And a white colleague would make racist jokes and use the
word "nigger" to and in front of Span.

**Answer**:     Defendant denies the allegations of Paragraph 2.

3.     This openly racist environment in U.S. Bank's indirect auto lending group also
adversely impacted loan applicants. Span's white colleagues openly admitted and
joked about discriminating against applicants based on their supposed race.
Applicants with non-white names would have their applications denied despite
otherwise being qualified for a loan by these white underwriters who believed this
conduct would help them more easily meet bank metrics and increase their

compensation. Unlike his white colleagues, Span refused to engage in this modern-day racial redlining.

**Answer**:        Defendant denies the allegations of Paragraph 3.

4.        In October 2018, U.S. Bank hired a new manager, Brian Fioresi ("Fioresi"), to oversee Span's region. From the start, Fioresi was overtly hostile to Span, his only Black direct report. Relying on racist stereotypes of Black intelligence and absent any knowledge of Span's past performance, Fioresi stated he did not "trust" Span's analytical abilities and never would. Thus began a protracted multi-year campaign by Fioresi to get Span fired. Span complained to upper management, including but not limited to Andrew Cecere, the CEO of U.S. Bank, as well as human resources about Fioresi's attempts to set Span up for failure thereby justifying his termination. Span's complaints went unheeded and was ultimately terminated by Fioresi.

**Answer**:        Defendant admits Brian Fioresi became a Credit Executive – Dealer Services in or around September 2018 at which time he began managing the North Central region to which Plaintiff was assigned.  Defendant further admits that Fioresi terminated Plaintiff's employment in or around July 2020 for performance reasons.  Defendant denies the remaining allegations of Paragraph 4.

## PARTIES

5.        John Span is a resident of Freeport, Illinois, and at all times relevant was domiciled in Freeport.

**Answer**:        Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 5 and, therefore, denies same.

6.        Defendant U.S. Bank, N.A. (hereafter "Defendant" or "U.S. Bank") is a Fortune 500 company headquartered in Minneapolis.

**Answer**:        Defendant admits the allegations of Paragraph 6.

## JURISDICTION AND VENUE

7.        Plaintiff's federal claims arise under 42 U.S.C. § 1981. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343. This Court has supplemental jurisdiction over Plaintiff's state-law claims under the Illinois Human Rights Act ("IHRA") pursuant to 28 U.S.C. § 1367.

**Answer**:        Defendant admits the allegations of Paragraph 7 but denies all allegations of improper or unlawful conduct and denies that Plaintiff is entitled to any relief whatsoever.

8.        Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391 as a substantial part of the events or omissions giving rise to this case occurred in this district.

**Answer**:        Defendant admits that venue is proper but denies all allegations of improper or unlawful conduct and denies that Plaintiff is entitled to any relief whatsoever.

## FACTUAL ALLEGATIONS

9.        John Span was hired by U.S. Bank in 1996 as a bank teller.

**Answer:**        Defendant denies the allegations of Paragraph 9.

10.        He was subsequently promoted and employed as a loan officer and underwriter in U.S. Bank's mortgage lending department.

**Answer**:        Defendant admits the allegations of Paragraph 10.

11.        Span later transferred to U.S. Bank's Indirect Lending Department, where he served as an underwriter for more than a decade until his termination.

**Answer**:        Defendant admits the allegations of Paragraph 11.

12.        Within Indirect Lending, Span was assigned to the North Central Region, which encompassed the following states: Iowa, North Dakota, South Dakota, Illinois, Indiana, Michigan, Wisconsin, and Minnesota.

**Answer**:        Defendant admits the allegations of Paragraph 12.

13.        U.S. Bank's indirect auto lending department provides financing through auto dealerships to car customers purchasing vehicles.

**Answer**:        Defendant admits the allegations of Paragraph 13.

14.        The lending is "indirect" because the customer obtains financing through the dealership, rather than dealing directly with the bank.

**Answer**:        Defendant admits the allegations of Paragraph 14.

3

15.     At all times relevant, the North Central Region was serviced by 15-20 underwriters, including Mr. Span.

**Answer**:     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 15 and, therefore, denies same.

16.     Working within this North Central Region, Span was subjected to a toxic and racially hostile work environment.

**Answer**:     Defendant denies the allegations of Paragraph 16.

17.     One of Span's manager, Jim Bieganowski, would tell Span every Friday, before the weekend, "don't go to jail and don't beat your wife," or words to that effect. These comments were racist, reflecting stereotypical tropes about Black violence and criminality.

**Answer**:     Defendant denies the allegations of Paragraph 17.

18.     Jim Bieganowski would make these comments publicly, including in front of U.S. Bank managers Matthew Woda and Mark Hammond.

**Answer**:     Defendant denies the allegations of Paragraph 18.

19.     Despite the overt public nature of these racist comments, U.S. Bank took no action to discipline Bieganowski.

**Answer**:     Defendant denies the allegations of Paragraph 19.

20.     U.S. Bank also took no action to protect Span from this toxic work environment.

**Answer**:     Defendant denies the allegations of Paragraph 20.

21.     Recognizing that U.S. Bank had created a toxic, consequence free workplace, Span's colleagues felt comfortable racially harassing Span, the only Black underwriter.

**Answer**:     Defendant denies the allegations of Paragraph 21.

22.     One white colleague routinely used the word "nigger" in workplace conversations with Span.

**Answer**:     Defendant denies the allegations of Paragraph 22.

23. This colleague and others also openly made racist jokes about Blacks and other ethnic minorities in Span's presence, and again, Mark Hammond overheard these racist jokes.

**Answer**: Defendant denies the allegations of Paragraph 23.

24. U.S. Bank took no action to discipline any North Central underwriters for use of racist language or making racist jokes.

**Answer**: Defendant denies the allegations of Paragraph 24.

25. An underwriter "analyzes, evaluates and makes decisions on consumer loan and lease applications."

**Answer**: Defendant admits the allegations of Paragraph 25.

26. The position requires balancing two often conflicting goals. The first goal is to "grow loan volumes," while avoiding significant dilution of the "credit quality" of the loan pool (avoiding significant numbers of delinquencies and defaults within the loan pool that impacts overall profitability).

**Answer**: Defendant denies the allegations of Paragraph 26.

27. During Span's tenure in Indirect Lending, U.S. Bank used the following metrics to assess indirect lending underwriters' performance: (1) Quality of Lending; (2) Production; (3) Customer Service; and (4) Teamwork/Dealer Management/Relationships.

**Answer**: Defendant admits that Quality of Lending, Production, Customer Service and Teamwork/Dealer Management/Relationships were some of the criteria used to assess underwriter performance. Defendant denies the remaining allegations of Paragraph 27.

28. Within the Quality of Lending category, the relevant metrics were: (a) monthly quality assurance (QA) reviews; (b) percentage of loans written outside U.S. bank underwriting and pricing guidelines; (c) number of Non-Conforming Loans (NCLs); and (d) number of Early Payment Defaults (EPDs).

**Answer**: Defendant admits that monthly quality assurance (QA) reviews, percentage of loans written outside U.S. bank underwriting and pricing guidelines, number of Non-Conforming Loans (NCLs) and number of Early Payment Defaults (EPDs) were some of the criteria assessed under Quality of Lending. Defendant denies the remaining allegations of Paragraph 28.

29.     The Production category metrics focused on assessing raw numbers of loans underwritten by each underwriter in terms of: (a) total decisions; (b) funded volume; (c) capture ratio; (d) approved ratio; and (e) phone calls.

**Answer:**     Defendant admits that total decision, funded volume, capture ratio, approved ratio and phone calls were some of the criteria assessed under Production. Defendant denies the remining allegations of Paragraph 29.

30.     The majority of these metrics were assessed against averages of the performance of all North Central underwriters. For instance, underwriters were expected to fund total volume of at least 80% of the North Central team average.

**Answer:**     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 30 and, therefore, denies same.

31.     Other metrics were measured as a percentage of all the loans written by the individual underwriter, such as the number of loans written that constituted policy or price exceptions.

**Answer:**     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 31 and, therefore, denies same.

32.     Underwriter Customer Service was assessed by measuring the turnaround time for application decisions, amongst other metrics.

**Answer**:     Defendant admits the allegations of Paragraph 32.

33.     When assessing underwriters, U.S. Bank put greatest weight on EPDs. Underwriters with too many charge-offs or delinquencies would not only suffer in terms of their bonuses, but such outcomes were grounds for termination.

**Answer**:     Defendant denies the allegations of Paragraph 33.

34.     All loan applications coming into U.S. Bank were first reviewed by an automated system.

**Answer**:     Defendant admits the allegations of Paragraph 34 as they relate to the indirect auto lending group. Defendant is without knowledge of information sufficient to form a belief as to the remaining allegations of Paragraph 34 and, therefore, denies same.

35.     The system screened loans based on certain criteria such as credit score, income, loan value, vehicle type, and loan term.

**Answer**:     Defendant admits that the automated system used by the indirect auto lending group evaluated loans based upon certain criteria such as credit score, income, loan value, vehicle type and loan term.  Defendant denies the remaining allegations of Paragraph 35.

36.     Loans that were approved through this system are referred to as "auto approvals."

**Answer:**     Defendant admits the allegations of Paragraph 36.

37.     Absent any interaction by an underwriter, these loans did not impact an underwriter's metrics.

**Answer**:     Defendant admits the allegations of Paragraph 37 as they relate to the indirect auto lending group.  Defendant is without knowledge of information sufficient to form a belief as to the remaining allegations of Paragraph 37 and, therefore, denies same.

38.     However, auto approval loans could be selectively picked out of the auto-approval queue and opened by underwriters who could modify the terms of the loan to make it more favorable and increase the chance of the dealer/applicant choosing the U.S. Bank loan over a competing loan.

**Answer:**   Defendant admits that, upon a request from a dealer, an underwriter could modify the terms of a loan to benefit the applicant by making the terms more favorable and thereby increasing the chance that the applicant would choose U.S. Bank over a competing loan.  Defendant denies the remaining allegations of Paragraph 38.

39.     If the underwriter modified the loan as described in paragraph 36, the underwriter would get credit for originating that loan.

**Answer**:  Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 39 and, therefore, denies same.

40. Additionally, at times the automated system would approve a loan that did not precisely conform to the Bank's guidelines and an underwriter would be required to review that loan and propose a modification to bring the loan application in conformance with lending guidelines. These loans would be credited to the reviewing [sic] as having originated that loan.

**Answer**: Defendant admits that, at times, the automated system used by the indirect lending group would approve a loan that did not precisely conform to the U.S. Bank's guidelines and an underwriter would be required to review that loan and propose a modification to bring the loan application in conformance with lending guidelines. Defendant is without knowledge or information sufficient to form a belief as to the remaining allegation of Paragraph 40 and, therefore, denies same.

41. Where a loan application was denied by the automated system, underwriters would review the denial for purposes of identifying the reason for the denial and whether the terms could be modified such that it would be acceptable per U.S. Bank's lending guidelines. The reviewing underwriter received credit for originating these loans as well.

**Answer**: Defendant admits that when a loan application was denied by the automated system used by the indirect auto lending group, underwriters would review the denial for purposes of identifying the reason for the denial and whether the terms could be modified such that it would be acceptable per U.S. Bank's lending guidelines. Defendant is without knowledge or information sufficient to form a belief as to the remaining allegation of Paragraph 41 and, therefore, denies same.

42. Applications could be denied where the applicant had sufficient creditworthiness but the terms of the loan (e.g. the length of the loan being in excess of 60 months) were outside the bank's guidelines. The underwriters' goal was to try to offer a loan arrangement with terms that met the applicant's desires while conforming with U.S. Bank's lending guidelines.

**Answer**: Defendant admits the allegations of Paragraph 42.

8

43. During his time working in U.S. Bank's North Central Region, Span was the only Black underwriter.

**Answer**: Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 43 and, therefore, denies same.

44. Within the North Central Region, there was an informal territory system amongst the underwriters whereby each underwriter built relationships with certain dealers and had "first dibs" on reviewing loan applications from those dealers.

**Answer**: Defendant denies the allegations of Paragraph 44 and its accompanying footnote.

45. From the start of Span's employment in Indirect Lending until September 2018 when Fioresi assumed the manager position, Span was designated as a "roaming" underwriter who covered for white underwriters when they were out sick, on vacation, or out to lunch. He handled overflow applications throughout the entire North Central Region.

**Answer**: Defendant denies the allegations of Paragraph 45.

46. Accordingly, Span did not have a "territory" or dedicated dealers over whose deals he had "first dibs."

**Answer**: Defendant denies the allegations of Paragraph 46.

47. Not having his own "territory" or dedicated dealer network hindered Span's ability to obtain greater compensation or meet certain underwriter metrics.

**Answer**: Defendant denies the allegations of Paragraph 47.

48. Span also learned that certain (white) North Central underwriters would avoid approving deals in certain areas of the Region based on that area's reputation as a "bad area" for lending.4

**Answer**: Defendant denies the allegations of Paragraph 48.

49. One such "bad area" was the south side of Chicago and nearby south suburbs, an area that according to the 2020 U.S. Census is over 93% African American.

**Answer**: Defendant denies the allegations of Paragraph 49.

50. Like a game of racist loan application hot potato, certain North Central underwriters would procrastinate by "taking lunch" or "using the restroom" until some other underwriter was forced to handle the geographically undesirable loan application.

9

**Answer**:          Defendant denies the allegations of Paragraph 50.

51.     These underwriters equated loans to Blacks, Hispanics, and other ethnic groups as "riskier" and simply refused to touch those deals.

**Answer**:          Defendant denies the allegations of Paragraph 51.

52.     The motivation for avoiding loans from "bad areas" was to avoid EPDs and thereby improve their own performance as measured by U.S. Bank's metrics.

**Answer**:          Defendant denies the allegations of Paragraph 52.

53.     These metrics, and the high importance U.S. Bank placed on avoiding EPDs also encouraged other racial discrimination on the part of underwriters.

**Answer**:          Defendant denies the allegations of Paragraph 53.

54.     North Central underwriters would engage in name-based discrimination. Loan applications reviewed by underwriters with "ethnic sounding" names (e.g., names that they arbitrarily decided, based presumably on racial stereotypes, "sounded" African, Muslim, African American, or Hispanic) would be denied loans even where the quantitative portions of the application (credit score, income, etc.) would merit approval.

**Answer**:          Defendant denies the allegations of Paragraph 54.

55.     Further, applicants with addresses in predominantly minority neighborhoods or neighborhoods with a "bad" reputation would have their applications denied even where the quantitative portions of the application (credit score, income, etc.) would merit approval.

**Answer**:          Defendant denies the allegations of Paragraph 55.

56.     Delays as a result of underwriter's avoidance of handling an application could result in applicants having less bargaining power to negotiate the best possible deal by playing one lender off against another. For example, an applicant who banked at another institution, and wanted to obtain a loan from that institution, could not use a competing offer from U.S. Bank to negotiate more favorable loan terms with their bank.

**Answer**:          Defendant denies that it engaged in the practice alleged by plaintiff and, therefore, denies the allegations of Paragraph 56.

57.     Further, when North Central underwriters engaged in redlining to deny a loan application based on an applicant's name, address, or the location of the dealership,

the applicant was harmed in that the applicant received less access to credit (via receiving less credit options) as a white applicant with identical quantitative creditworthiness. As a result, these redlined applicants may have been forced to accept a loan offered by another lending institution on less favorable terms.

**Answer**:     Defendant denies that it engaged in the practices alleged by Plaintiff and, therefore,

denies the allegations of Paragraph 57.

    58.    Disgusted by the practices of his colleagues, Span refused to engage in racial discrimination in his underwriting.

**Answer:**     Defendant denies that it engaged in the practices alleged by Plaintiff and, therefore,

denies the allegations of paragraph 58.

    59.    Despite being pigeonholed as a "roamer," being denied a fair opportunity to earn compensation his white colleagues received, and facing routine and outrageous racial harassment, Span managed to put his head down and do his job as best he could under his circumstances.

**Answer**:     Defendant denies the allegations of Paragraph 59.

    60.    Prior to September 2018, when Fioresi became his manager, Span had no disciplinary record and consistently received strong performance reviews.

**Answer**:     Defendant denies the allegations of Paragraph 60.

    61.    In September 2018, U.S. Bank hired Fioresi to be the new manager of the North Central Region of its indirect lending department.

**Answer**:     Defendant admits that Brian Fioresi became a Credit Executive – Dealer Services

in or around September 2018 at which time he began managing the North Central region's indirect

lending department.

    62.    In his first meeting with his new team, Fioresi made clear that he wanted to clean house of U.S. Bank's older and more experienced underwriters. Fioresi publicly and unabashedly stated that he "did not like working with employees that had been at the bank for longer than ten years." He said that he "preferred young blood." Fioresi promised that if he needed to fire one of the older underwriters "to set an example," he would.

**Answer**:     Defendant denies the allegations of Paragraph 62.

63.     Just as he promised, Fioresi immediately set his sights on removing Span, the only Black underwriter on the team, and one of its oldest and most experienced.

**Answer**:     Defendant denies the allegations of Paragraph 63.

64.     In their first face-to-face meeting in January 2019, Fioresi told Span directly that he did not "trust" Span's analytical ability as an underwriter and that he never would.

**Answer**:     Defendant denies the allegations of Paragraph 64.

65.     Fioresi's assumption that he did not and never would "trust" Span's "analytical" ability was based purely on racist and stereotypical assumptions, at the time he made the comment, Fioresi had never previously met Span and could not yet have any knowledge to form a basis for the assessment of his analytical capabilities.

**Answer**:     Defendant denies the allegations of Paragraph 65.

66.     Fioresi proceeded to criticize Span for his performance based on the performance metrics described in Paragraphs 25-33. But as U.S. Bank and Fioresi were aware, it was impossible for Span, as a "roamer," to compete in many of these metrics against other underwriters with dedicated territories.

**Answer**:     Defendant denies the allegations of Paragraph 66.

67.     In or about January 2019, Fioresi formalized the previously informal territory system. He divided up the North Central Region into smaller territories and assigned the best territories to his preferred underwriters.

**Answer**:     Defendant denies the allegations of Paragraph 67.

68.     One of the formally demarcated territories Fioresi gerrymandered was the South Chicago, South Suburbs territory, which included the aforementioned "bad area" in which several white underwriters avoided lending.

**Answer**:     Defendant denies the allegations of Paragraph 68.

69.     This formalized territory system made it easier for Fioresi's favored underwriters to avoid lending in South Chicago and constituted literal redlining – a line was drawn around the area containing the largest population of African Americans in the North Central Region and every underwriter but those targeted by Fioresi to have this territory could simply avoid underwriting deals from this territory.

**Answer**:     Defendant denies the allegations of Paragraph 69.

70. Auto sales are not a Monday to Friday business; therefore, the indirect lending department is required to operate on Saturdays and was typically staffed with approximately five underwriters on Saturdays.

**Answer**: Defendant admits the allegations of Paragraph 70.

71. As such, the favored underwriters who engaged in the aforementioned redlining practices were still required to handle loans from outside their assigned territory if they were working on Saturday.

**Answer**: Defendant denies that it engaged in the practices alleged by Plaintiff and, therefore,

denies allegations of Paragraph 71.

72. The previously described discrimination against applicants based on their name, or the geographic location of the dealership or the applicants home address continued under Fioresi.

**Answer**: Defendant denies the allegations of Paragraph 72.

73. This applicant name- and address-based-discrimination also occurred within the underwriters' own territories. Therefore, even applicants with non-white sounding names who did not reside or purchase cars in South Chicago were subject to the same discrimination as described earlier.

**Answer**: Defendant denies the allegations of Paragraph 73.

74. Initially under Fioresi's new formal territory system, the only underwriter who wasn't assigned a territory was John Span, one of the oldest underwriters, and the lone African American, in the North Central region. For much of 2019, Span was responsible for handling overflow from the territories of the other underwriters.

**Answer**: Defendant admits that Fioresi did not initially assign Plaintiff a territory because of

Plaintiff's performance issues. Defendant denies the remaining allegations of Paragraph 74.

75. Unsurprisingly, Span's performance as measured by several of U.S. Bank's underwriter metrics paled in comparison to his peers.

**Answer**: Defendant admits that Plaintiff's performance as measured against his underwriter

peers was poor. Defendant denies the remaining allegations of Paragraph 75.

76. Fioresi subsequently criticized Span's performance during quarterly reviews for the first three quarters of 2019. Span rightly complained that Fioresi's criticism was not fair given that Span, unlike his peers, was a "roamer" with no assigned territory.

**Answer**:      Defendant admits that Fioresi consistently coached Plaintiff in order to help him

improve his poor performance.  Defendant denies the remaining allegations of Paragraph 76.

77.     Recognizing that it would be difficult to justify firing Span if he was a "roamer" who lacked a sales territory, in or about October 2019, Fioresi assigned Span a territory for the first time in his career, unsurprisingly it was the "Chicago South" territory.

**Answer**:      Defendant admits that Plaintiff requested to be assigned to an open territory and

Fioresi obliged that request in or around October 2019.  Defendant denies the remaining allegations

of Paragraph 77.

78.     This territory was regarded as the worst territory by underwriters in the North Central region, who perceived this area as having a higher rate of fraud, charge-offs, delinquencies, and defaults. Compared to the other territories, Chicago South had lower rates of luxury vehicle purchases, which in turn generated fewer high dollar value loans.

**Answer**:      Defendant denies the allegations of Paragraph 78.

79.     Accordingly, underwriters simply avoided underwriting loans originating out of this territory unless they had no way to side-step or pass off handling the application.

**Answer**:      Defendant denies the allegations of Paragraph 79.

80.     In the months before Fioresi assigned Span to cover the Chicago South territory, **three** white underwriters had been assigned to cover the territory. All three had performed poorly as measured by U.S. Bank metrics. All three asked to leave the territory and were quickly assigned a new territory or transferred to a different department within the Bank.

**Answer**:      Defendant denies the allegations of Paragraph 80.

81.     Of all the underwriter metrics, Fioresi put greatest emphasis on underwriters increasing their funded volume – to increase the total dollar amount of loans issued.

**Answer**:      Defendant denies the allegations of Paragraph 81.

82.     Fioresi and U.S. Bank understood that Span, like the three underwriters who came before him, could not meet both Fioresi's demand for high funded volume while also meeting the metrics for loan quality in the Chicago South territory.

14

**Answer**:       Defendant denies the allegations of Paragraph 82.

83.    In Chicago South, unlike the other territories, it was impossible to maintain this balance in accordance with the bank's metrics. If Span acted with appropriate caution in declining to approve problematic applications, Fioresi would discipline him for not meeting funded volume metrics. If Span approved riskier loans to increase his funded volume and had higher defaults or delinquencies, Fioresi would discipline him for approving bad loans.

**Answer**:       Defendant denies the allegations of Paragraph 83.

84.    Like the three previous white underwriters assigned to the Chicago South territory, Span could not meet the Fioresi's and the bank's metrics; but unlike the others, he was not reassigned or offered a different position. Instead, Fioresi and U.S. Bank in a transparently racially and ageist motivated campaign, disciplined and subsequently terminated him.

**Answer**:       Defendant denies the allegations of Paragraph 84.

85.    In January 2020, U.S. Bank formally disciplined Span for the first time in his two-decade career at U.S. Bank, issuing what it called a "verbal counseling." Span was criticized for his performance against certain metrics.

**Answer**:       Defendant admits that it issued Plaintiff a verbal counseling in January 2020 for poor performance. Defendant denies the remaining allegations of Paragraph of Paragraph 85.

86.    The verbal counseling escalated to an "action plan" in April 2020, right as the COVID-19 pandemic shut down most of the American economy. The "action plan" was, again, heavily focused on Span's performance against certain of the bank's racially biased metrics.

**Answer**:       Defendant admits that, in or around April 2020, it issued Plaintiff an action plan to help him address his poor performance. Defendant denies the remaining allegations of Paragraph 86.

87.    In the wake of being assigned the "action plan," Span was assigned a "coach" who advised him on methods to improve his performance on certain metrics.

**Answer:**       Defendant admits the allegations of Paragraph 87.

88.    The "coach" advised him to do what other underwriters did to boost their numbers. Specifically, to game the system by pulling loans approved by U.S. Bank's automated underwriting system out of the "auto approval" queue and tweak the

terms of the loan slightly (e.g., slightly improve the interest rate compared to the auto-approved interest rate). Thereby taking credit for origination of that loan.

**Answer**:      Defendant denies the allegations of Paragraph 88.

89.      Span had previously been informed that it was against bank policy to pull loans from this pool of "auto approvals," but the coach informed him this was not true— in fact, the white underwriters regularly cherry picked the auto approval queue to boost their numbers.

**Answer**:      Defendant denies the allegations of Paragraph 89.

90.      By following his coach's instructions, Span was able to improve his loan numbers.

**Answer**:      Defendant denies the allegations of Paragraph 90.

91.      In doing this, Span discovered that when certain white underwriters would cherry pick auto approvals, they would refuse to select deals with applicants who had non-white sounding names.

**Answer**:      Defendant denies the allegations of Paragraph 91.

92.      It was Span's understanding that his colleagues equated risk to the applicant's race/ethnicity and discriminated accordingly in an attempt to meet U.S. Bank metrics and boost their bonuses.

**Answer**:      Defendant denies the allegations of Paragraph 92.

93.      Upon learning what Span was doing, Fioresi berated Span, until he learned that Span had been told by his coach to emulate his white colleagues and cherry pick the auto approval queue.

**Answer**:      Defendant denies the allegations of Paragraph 93.

94.      During 2020, while Span continued to work to improve his loan numbers, he repeatedly complained to U.S. Bank's human resources department and contacted U.S. Bank executives, including its President and CEO Andrew Cecere, about Fioresi's discriminatory and hostile treatment.

**Answer**:      Defendant admits that after Plaintiff received performance counselings, he began complaining about alleged unfair treatment. Defendant further admits Plaintiff never raised any complaints of alleged race discrimination or alleged improper lending practices prior to his July 1,

2020 discharge for poor performance.  Defendant denies the remaining allegations of Paragraph 94.

95.     In particular, and amongst other complaints, Span shared Fioresi's comment about wanting to fire older and more experienced employees in favor of "young blood." He also sought the "opportunity to work under a different manager who is non biased [*sic*] towards me. Mr. Fioresi is biased and is showing a pattern of harassment in his interactions with me."

**Answer**:     Defendant admits that after Plaintiff began receiving performance counselings, he made the above referenced complaint and request.  Defendant denies the remaining allegations of Paragraph 95.

96.     In response to and in retaliation for Span's complaints, Fioresi and U.S. Bank escalated its efforts to fire him.

**Answer**:     Defendant denies the allegations of Paragraph 96.

97.     Despite Span's improvement in the second quarter of 2020, during the worst of the COVID-19 crisis, U.S. Bank and Fioresi continued their crusade to terminate him.

**Answer**:     Defendant denies the allegations of Paragraph 97.

98.     In July 2020, U.S. Bank fired Span.

**Answer**:     Defendant admits the allegations of Paragraph 98.

99.     U.S. Bank's sole justification for doing so was Span's failure to satisfy certain metrics in April 2020, the peak of the COVID-19 pandemic and corresponding low point of lending volume.

**Answer**:     Defendant admits that its sole justification for terminating Plaintiff's employment was his poor performance.  Defendant denies the remaining allegations of Paragraph 99.

100.     Span was the only underwriter terminated in the North Central Region on this basis.

**Answer**:     Defendant admits that Plaintiff was the only underwriter in the North Central Region whose employment was terminated in July 2020 for poor performance.  Defendant denies the remaining allegations of Paragraph 100.

101.     Span's termination also contrasts with U.S. Bank's treatment of the three white underwriters who previously worked the South Chicago region, who were reassigned to different territories or bank departments rather than terminated.

**Answer**:     Defendant denies the allegations of Paragraph 101.

102.     As a direct and proximate result of U.S. Bank's conduct, Span has suffered wage and financial losses and irreparable damage to his career.

**Answer**:     Defendant denies the allegations of Paragraph 102.

103.     As a direct and proximate result of U.S. Bank's conduct, Span has suffered emotional and mental distress, loss of reputation, embarrassment and humiliation, loss of enjoyment of life, inconvenience, and other non-pecuniary losses.

**Answer**:     Defendant denies the allegations of Paragraph 103.

104.     By the acts and conduct described above, U.S. Bank intended to cause Span severe emotional distress, or acted in reckless disregard of the injury that its actions had caused and would cause to Span.

**Answer**:     Defendant denies the allegations of Paragraph 104.

105.     Punitive damages are appropriate because U.S. Bank's conduct was malicious and/or U.S. Bank was recklessly indifferent to Span's protected rights.

**Answer**:     Defendant denies the allegations of Paragraph 105.

106.     Span timely filed a charge of discrimination with the Illinois Department of Human Rights ("IDHR"), alleging age and race discrimination and retaliation. Span opted out of the IDHR's investigation and the IDHR issued a Notice of Opt Out. Accordingly, Span has satisfied all the necessary prerequisites to filing this suit.

**Answer**:     Defendant denies the allegations of Paragraph 106.

## COUNT I
## [ALLEGED] RACE DISCRIMINATION IN VIOLATION OF 42. U.S.C § 1981

107.     Plaintiff realleges Paragraphs 1-106 and incorporates them by reference as though fully stated herein as part of Count I of this Complaint.

**Answer**:     Defendant incorporates its answers to Paragraph 1-106 as if fully stated herein.

108.     Section 1977 of the Revised Statutes, 42 U.S.C. § 1981, as amended, guarantees persons of all races the same right to make and enforce contracts, regardless of race. The phrase "make and enforce" includes the making, performance, modification,

18

and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship, including employment relationships. Section 1981 also prohibits employers from engaging in racial harassment of their employees.

**Answer**:        Defendant admits the allegations of Paragraph 108.

109.   As described above, U.S. Bank maintained discriminatory and harassing employment practices that constitute illegal race discrimination in violation of 42 U.S.C. Section 1981.

**Answer**:        Defendant denies the allegations of Paragraph 109.

110.   Plaintiff was subjected to and harmed by U.S. Bank's discrimination based on his race, Black.

**Answer**:        Defendant denies the allegations of Paragraph 110.

111.   As a direct and proximate result of U.S. Bank's conduct, Plaintiff suffered damages.

**Answer**:        Defendant denies the allegations of Paragraph 111.

## COUNT II
## [ALLEGED] RETALIATION IN VIOLATION OF 42. U.S.C § 1981

112.   Plaintiff realleges Paragraphs 1 through 106 [sic] and incorporates them by reference as though fully stated herein as part of Count II of this Complaint.

**Answer**:        Defendant incorporates its answers to Paragraphs 1 through 111 as if fully set forth

herein.

113.   Section 1981 makes it unlawful for an employer to retaliate against an employee because that employee engaged in protected activity, such as reporting or challenging racial discrimination.

**Answer**:        Defendant admits the allegations of Paragraph 113.

114.   As described above, Plaintiff engaged in protected activity.

**Answer**:        Defendant denies the allegations of Paragraph 114.

115.   U.S. Bank took adverse employment action against Plaintiff in retaliation for engaging in this protected activity.

**Answer**:        Defendant denies the allegations of Paragraph 115.

19

116.   Plaintiff was subjected to and harmed by U.S. Bank's retaliation after he reported U.S. Bank's discriminatory conduct.

**Answer**:   Defendant denies the allegations of Paragraph 116.

117.   As a direct and proximate result of U.S. Bank's conduct, Plaintiff suffered damages.

**Answer**:   Defendant denies the allegations of Paragraph 117.

## COUNT III
## [ALLEGED] RACE DISCRIMINATION IN VIOLATION OF IHRA
## ([ALLEGED] DISPARATE TREATMENT)

118.   Plaintiff realleges Paragraphs 1 through 106 [sic] and incorporates them by reference as though fully stated herein as part of Count III of this Complaint.

**Answer**:   Defendant incorporates its answers to Paragraph 1-117 as if fully set forth herein.

119.   Under IHRA, it is a civil rights violation for any employer to refuse to hire, segregate, or to act with respect to recruitment, hiring, promotion, renewal of employment, selection for training or apprenticeship, discharge, discipline, tenure or terms, privileges or conditions of employment on the basis of unlawful discrimination, which includes race discrimination. 775 ILCS 5/2-102(A). IHRA also prohibits harassment of employees based on their race. *Id.*; 775 ILCS 5/2-101(E-1).

**Answer**:   Defendant admits the allegations of Paragraph 119.

120.   Plaintiff was an employee of U.S. Bank, and U.S. Bank was Plaintiff's employer within the meaning of the IHRA. 775 ILCS 5/2-101.

**Answer**:   Defendant admits the allegations of Paragraph 120.

121.   As described above, U.S. Bank discriminated against and harassed Plaintiff on account of his race, Black.

**Answer**:   Defendant denies the allegations of Paragraph 121.

122.   As a direct result of this violation of the IHRA, Plaintiff suffered damages in the form of lost wages, benefits, and employment opportunities, and severe emotional distress.

**Answer**:   Defendant denies the allegations of Paragraph 122.

## COUNT IV
## [ALLEGED] RACE DISCRIMINATION IN VIOLATION OF IHRA
## ([ALLEGED] DISPARATE IMPACT)

123.  Plaintiff realleges Paragraphs 1 through 106 [sic] and incorporates them by reference as though fully stated herein as part of Count IV of this Complaint.

**Answer:**  Defendant incorporates its answers to Paragraph 1-121 as if fully set forth herein.

124.  Under IHRA, it is a civil rights violation for any employer to refuse to hire, segregate, or to act with respect to recruitment, hiring, promotion, renewal of employment, selection for training or apprenticeship, discharge, discipline, tenure or terms, privileges or conditions of employment on the basis of unlawful discrimination, which includes race discrimination. 775 ILCS 5/2-102(A). IHRA also prohibits harassment of employees based on their race. *Id*.; 775 ILCS 5/2-101(E-1).

**Answer**:  Defendant admits the allegations of Paragraph 124.

125.  Plaintiff was an employee of U.S. Bank, and U.S. Bank was Plaintiff's employer within the meaning of the IHRA. 775 ILCS 5/2-101.

**Answer**:  Defendant admits the allegations of Paragraph 125.

126.  As described above, U.S. Bank engaged in policies and practices that had a disparate impact on its Black underwriter, Span. In particular, U.S. Bank evaluated its underwriters using facially neutral metrics that disproportionately and negatively affected its Black underwriter, Span.

**Answer**:  Defendant denies the allegations of Paragraph 126.

127.  As a direct result of this violation of the IHRA, Plaintiff suffered damages in the form of lost wages, benefits, and employment opportunities, and severe emotional distress.

**Answer**:  Defendant denies the allegations of Paragraph 127.

## COUNT V
## [ALLEGED] AGE DISCRIMINATION IN VIOLATION OF IHRA

128.  Plaintiff realleges Paragraphs 1 through 106 [sic] and incorporates them by reference as though fully stated herein as part of Count V of this Complaint.

**Answer:**  Defendant incorporates its answers to Paragraph 1-127 as if fully set forth herein.

129.     Under IHRA, it is a civil rights violation for any employer to refuse to hire, segregate, or to act with respect to recruitment, hiring, promotion, renewal of employment, selection for training or apprenticeship, discharge, discipline, tenure or terms, privileges or conditions of employment on the basis of unlawful discrimination, which includes age discrimination against individuals who are more than 40 years old. 775 ILCS 5/2-102(A).

**Answer**:     Defendant admits the allegations of Paragraph 129.

130.     Plaintiff was an employee of U.S. Bank, and U.S. Bank was Plaintiff's employer within the meaning of the IHRA. 775 ILCS 5/2-101.

**Answer**:     Defendant admits the allegations of Paragraph 130.

131.     As described above, U.S. Bank discriminated against Plaintiff on account of his age, which was greater than 40.

**Answer**:     Defendant denies the allegations of Paragraph 131.

132.     As a direct result of this violation of the IHRA, Plaintiff suffered damages in the form of lost wages, benefits, and employment opportunities, and severe emotional distress.

**Answer**:     Defendant denies the allegations of Paragraph 132.

## COUNT VI
## [ALLEGED] RETALIATION IN VIOLATION OF IHRA

133.     Plaintiff realleges Paragraphs 1 through 106 [sic] and incorporates them by reference as though fully stated herein as part of Count V of this Complaint.

**Answer:**     Defendant incorporates its answers to Paragraph 1-133 as if fully set forth herein.

134.     Under IHRA, it is a civil rights violation for an employer to retaliate against employee "because he or she has opposed that which he or she reasonably and in good faith believes to be unlawful discrimination." 775 ILCS 5/6-101.

**Answer**:     Defendant admits the allegations of Paragraph 134.

135.     Plaintiff was an employee of U.S. Bank, and U.S. Bank was Plaintiff's employer within the meaning of the IHRA. 775 ILCS 5/2-101.

**Answer**:     Defendant admits the allegations of Paragraph 135.

136.     As described above, Plaintiff opposed practices which he reasonably and in good faith believed to be unlawful discrimination.

**Answer**:     Defendant denies the allegations of Paragraph 136.

137.    As described above, U.S. Bank took adverse employment action against Plaintiff in retaliation for engaging in this protected activity.

**Answer**:     Defendant denies the allegations of Paragraph 137.

138.    As a direct result of this violation of the IHRA, Plaintiff suffered damages in the form of lost wages, benefits, and employment opportunities, and severe emotional distress.

**Answer**:     Defendant denies the allegations of Paragraph 138.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against U.S. Bank and award the following relief:

a.    Declare that the acts and conduct of U.S. Bank are unlawful and violate 42 U.S.C. § 1981 and the IHRA;
b.    Award Plaintiff the value of all compensation and benefits lost as a result of U.S. Bank's unlawful conduct;
c.    Award Plaintiff the value of all compensation and benefits he will lose in the future as a result of U.S. Bank's unlawful conduct;
d.    Award Plaintiff compensatory damages, including but not limited to damages for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, loss of reputation, and other non-pecuniary losses;
e.    Award Plaintiff punitive damages due to U.S. Bank's malicious conduct and/or reckless or callous indifference to the statutorily protected rights of Plaintiff;
f.    Award Plaintiff prejudgment interest;
g.    Award Plaintiff attorneys' fees, costs, and disbursements; and
h.    Award Plaintiff such other make whole equitable, injunctive, and legal relief as this Court deems just and proper.

**Answer:**     Defendant denies the allegations of the unnumbered WHEREFORE Paragraph

under "Prayer for Relief" and denies the Plaintiff is entitled to any relief whatsoever.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues of fact and damages triable in this action.

**Answer**:     Defendant admits that Plaintiff demands a trial by jury but denies that it engaged in

any unlawful conduct and denies that Plaintiff is entitled to any relief whatsoever.

## DEFENSES

Defendant hereby states the following affirmative and additional defenses to Plaintiff's Complaint but does not assume the burden of proof on any such defenses except as required by applicable law with respect to the particular defense asserted. Defendant reserves the right to assert other affirmative defenses and/or to otherwise supplement this Answer upon discovery of facts or evidence rendering such action appropriate.

1.     Defendant states that Plaintiff has failed to state a claim upon which relief can be granted.

2.     Defendant states that Plaintiff's claims are barred in whole or in part, by his failure to exhaust administrative remedies and/or the applicable statute of limitations.

3.     Defendant states that Plaintiff's claims are barred, in whole or in part, or his recoverable damages (if any, and which Defendant denies) should be reduced, because he failed to take reasonable steps to mitigate his damages.

4.     Defendant states that Plaintiff's claims are barred, in whole or in part, because all acts of Defendant affecting the terms and/or conditions of Plaintiff's employment, if any, were done in good faith and motivated by legitimate and non-discriminatory, non-retaliatory reasons. Defendant did not discriminate or retaliate against Plaintiff and did not violate any federal or state anti-discrimination statute.

5.     Defendant states that Plaintiff's claims for damages may be barred, in whole or in part, by the doctrine of after-acquired evidence and/or the doctrine of unclean hands.

6.     To the extent that Plaintiff asserts claims for punitive and/or liquidated damages and/or attorneys' fees under statutes which allow for punitive and/or liquidated damages and/or attorneys' fees, such claims fail as a result of Defendant's good faith efforts to comply with the

law.

Dated: January 18, 2022               Respectfully Submitted,

                                    By:    */s/ Cardelle B. Spangler*

                                    Cardelle B. Spangler
                                    Winston & Strawn LLP
                                    35 West Wacker Drive
                                    Chicago, Illinois 60601
                                    (312) 558-5600 (p)
                                    cspangler@winston.com
                                    Attorney for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on January 18, 2022, I caused a true and correct copy of the

foregoing Defendant's Answer and Defenses to Complaint to be served by electronic filing upon

counsel of record including:

Haskell Sidney Garfinkel
Matthew Fletcher
Garfinkel Group, LLC
6252 N. Lincoln Ave., Suite 200
Chicago, IL 60622
haskell@garfinkelgroup.com
matthew@garfinkelgroup.com

Matthew Jason Singer
Matt Singer Law, LLC
77 W. Wacker Dr., Ste. 4500
Chicago, IL 60601
matt@mattsingerlaw.com

*/s/ Cardelle B. Spangler*
Attorney for Defendant